[979 NYS2d 1]

ESTELLE A. CARR, Appellant-Respondent, and DENNIS BEAVER, as Executor of ROYCE K. HOFFMAN, Deceased, Respondent-Appellant, v ROSE A. CAPUTO, Defendant, HENRY ALPIZAR, Respondent, and PHILIP MANGERINO, Respondent-Appellant.

First Department, December 19, 2013

**APPEARANCES OF COUNSEL**

*Pollack Pollack Isaac & Di Cicco*, New York City (*Michael H. Zhu* and *Brian J. Isaac* of counsel), for appellant-respondent.

*Herbert Adler*, White Plains, for respondents-appellants.

*Schwaber & Kafer, P.C.*, New York City (*Susan M. Kafer* of counsel), for respondent.

## OPINION OF THE COURT

GISCHE, J.

These appeals involve years of disputes and litigation over ownership interests in a building located at 45-47 Second Avenue in Manhattan (the building), and interests in a partnership formed by the original owners of the building, after the building was purchased. Although a number of deeds have been recorded over the years purporting to convey interests in the building, and the partners who died bequeathed their interests to heirs, plaintiff Estelle A. Carr, and others at various times, have claimed that such conveyances and bequests were in violation of the partnership agreement the original owners executed in connection with a venture known as 45-47 Enterprises (1969 agreement). There were prior motions for summary judgment in 2001 before a different justice (Sheila Abdus-Salaam, J.), then presiding over this matter, which resulted in an order dated January 10, 2002 granting partial summary judgment (2002 order). No allocation of interests was ordered at that time because the court found certain factual disputes needed to be resolved. Nonetheless, eight years later and following further discovery, the motion court has, in the order presently being appealed, allocated all of the undivided shares in the building to the parties in various fractional shares "as partners and as tenants in common."

Only Carr, Philip Mangerino, as executor of the estate of J.G. Mangerino and as administrator of Frank Bradley's estate (collectively, Mangerino, sometimes Mangerino's estate), have appealed from that order. Henry Alpizar, individually and as executor of the estate of Dan Kampel (collectively, Alpizar), has filed responsive briefs. Rose A. Caputo, who is sued individually and in her capacity as the legal representative for interests previously held by Lil E. Dominguez and Joseph Sample, has not submitted any opposition to the appeal or cross appeal.

The issues presented by this limited appeal are whether, as argued by Carr, the 1969 agreement governs the disposition of the ownership interests in the building, as well as partnership interests or, as argued by Mangerino and Alpizar, ownership should be determined by the deeds and testamentary dispositions. Mangerino and Alpizar also argue that lack of standing, untimeliness and laches bar Carr's claims. In his cross appeal, Mangerino affirmatively claims that the estate of Mangerino has a $1/6$, not $1/12$, ownership in the building, based upon adverse possession. Carr argues that, under the 1969 agreement, Al-

pizar and Mangerino's interests are limited to book value, while Alpizar and Mangerino claim they have a direct interest in the building itself and consequently, share in its market value. The market value of the building exceeds book value by millions of dollars.

The undisputed facts establish that Carr along with six other individuals, including Kampel, Dominguez, Caputo, Bradley, Sample, and Hoffman, purchased the building as tenants in common, pursuant to a deed dated June 25, 1968 that was recorded. The building was comprised of six residential apartments and commercial space that was leased to various businesses. The 1968 deed provided for the following undivided interests: Carr, $1/6$; Kampel, $2/6$; Caputo and Dominguez, $1/6$ as joint tenants; Bradley and Sample, $1/6$ as joint tenants; and Hoffman, $1/6$. On June 26, 1968, Kampel conveyed one-half of his interest, i.e., $1/6$, to Charles Caspar and Keith Whitten, as joint tenants. That deed was recorded as well.

On May 1, 1969, all nine of the building's owners entered into the 1969 agreement for an unnamed partnership which later became known as 45-47 Enterprises. Although no certificate of partnership was filed, there were tax filings and other documents filed for the partnership over the years. The 1969 agreement recites that the parties have purchased the building for the sum of $47,000 and contains a detailed breakdown of how the purchase was financed. The agreement states that "the primary and sole purpose" for the partners having purchased the building was to make sure they each had a "permanent place of residence." The 1969 agreement itemizes, floor by floor, the "party" occupying each apartment, that person's monetary contribution towards the purchase of the building and classifies 60% of such contribution as a "capital contribution" whereas 40% is classified as a "loan."

According to the 1969 agreement, the parties' respective "percentage of interest and apartments occupied by each" is as follows: Carr, $1/6$; Bradley, $1/12$; Sample, $1/12$; Caspar, $1/12$; Whitten, $1/12$; Kampel, $1/6$; Hoffman, $1/6$; Caputo, $1/12$; Dominguez, $1/12$. Although the partners agreed that they would be responsible for maintaining the apartment they each occupy, the agreement provides that the partnership is responsible for maintaining, improving, and making repairs to the common areas of the building they share. Another provision in the agreement (section 19) prohibits the subletting of any apartment without the prior written consent of all the remaining partners. The 1969

agreement does not contain any provision regarding the partnership's dissolution nor does the agreement have an end date, rendering this an at-will partnership, as previously determined in this case by the court in the 2002 order. There are no provisions in the 1969 agreement indicating that title to or beneficial interest in the building would be transferred to the partnership at that or a later time. In fact, at no time since the execution of 1969 agreement has title to the building, or any part thereof, been held by the partnership. Title ownership of the building, as reflected in the recorded 1968 and 1969 deeds, remained unchanged when the 1969 agreement was first made.

The 1969 agreement contained limitations on how a partner's interest in the partnership could be sold or conveyed and also provided that a deceased partner's interest reverted to the partnership at death. Pursuant to sections 10 and 11 of the 1969 agreement, the partnership had a 30-day right of first refusal on any sale of a partner's interest and the partner wishing to sell was obligated to notify the partnership in writing of his or her desire to sell that interest. If the partnership declined to exercise its right, then the individual partners were given the opportunity to purchase the interest. The sale of an interest to the partnership or another partner was to be made at the "book value" of the interest at the time of the sale. Section 14 of the 1969 agreement provides that upon the death, retirement or incapacity of any partner, that partner's interest reverted to the partnership and the value of such interest would, as with a sale, be determined by the book value of the interest when the deceased partner died. The legal representative of an estate was required to execute and deliver any documents necessary to transfer the deceased partner's interest to the surviving partners only after receiving payment for the interest (1969 agreement § 15).

Dissension arose among the owners/partners about how to pay for the operating expenses of the building and by 1975, the fault line grew, dividing Caputo and Dominguez from the seven other owners. On November 20, 1975, those same seven owners met and signed a "Resolution and Dissolution with Statement of Accounting" (resolution), purporting to dissolve the partnership. That dissolution agreement was never signed by Caputo or Dominguez. Thereafter, those same seven owners took steps to convert the building to condominium ownership by, among other things, executing among themselves a series of deeds which they recorded. On November 5, 1976, those same seven partners

executed a "Plan of Apartment Ownership-Master Deed" (plan). Despite the resolution, tax documents for the 45-47 Enterprises partnership continued to be filed for a number of years thereafter. The tax documents included K-1s showing rental income.

On January 20, 1979, Caspar and Whitten executed a deed assigning their interests in the building to Carr for $25,000. In 1978, Sample moved out of the apartment he had shared with Bradley, never returning to the building. Sample and Bradley, like the other five owners, had signed deeds in 1975 in connection with the plan. When Sample moved out, J.G. Mangerino moved into the apartment and lived with Bradley until Bradley died in August 1980. When Bradley died, he left his entire estate to J.G. Mangerino. J.G. Mangerino remained in the apartment after Bradley died until his own death in October 1999, at which time his heirs assumed possession and control thereof. In 1991, Kampel died, leaving "all my shares in the partnership known as '4547 (sic) Enterprise Partnership' which partnership owns the apartment I live in located at 45 Second Avenue #3" to Alpizar. In May 2001, Hoffman died, leaving his $1/6$ interest to Carr, who, by a deed dated November 2, 2006, assigned half of that interest ($1/12$) to Caputo and Dominguez. In February 2004, Sample (who is now deceased) sold his $1/12$ interest to Caputo and Dominguez. Dominguez is now deceased as well, and the only remaining original partners are Carr and Caputo. Caputo is the executrix of the estate of Dominguez. Although some of these conveyances followed the formalities set forth in the 1969 agreement, most of them did not and were accomplished simply by bequests or sales.

Carr, Hoffman and Mangerino moved for summary judgment in 2001 seeking a declaration that no partnership had ever been formed despite the 1969 agreement, but if it had been formed, the partners dissolved it when they signed the resolution and later took steps to convert the building into a condominium. Caputo and Dominguez, who had not signed that resolution or any deeds conveying interests to any other partner, opposed the motion, as did Sample. Caputo, Dominguez and Sample also cross-moved for a declaration that the various transactions that had occurred over preceding years, purporting to transfer title, were null and void because they had been made in violation of the 1969 agreement. Caputo and Dominguez challenged, in particular, Carr's 1979 purchase of Caspar and Whitten's interests in the building for $25,000, although Caspar and Whitten had offered their interest to the partners and none of them had

expressed an interest in the offer at that time. Alpizar also moved for summary judgment at that time, seeking a declaration that there had never been a partnership, but even if there had been, the agreement had been repudiated and the claims of Caputo/Dominguez/Sample were barred by the doctrine of laches. Alpizar sought a declaration that he held a $1/6$ share which he had acquired by devise under Kampel's will.

In its 2002 order,[1] the court decided that the nine original owners had, in fact, formed a partnership which some of them tried to dissolve in 1975. However, since there had been no winding up of the partnership's affairs, as required under Partnership Law § 62, the partnership had continued to exist. The court found that the plan to convert the building into a condominium was ineffective and declared that the building had not been converted to condominium status in 1976. Although the 2002 order declared that the parties had formed a partnership in 1969, and the court noted that some of the formalities in the 1969 agreement had been observed when Carr purchased Caspar and Whitten's interest in 1979, the court found no evidence that all the partners had been notified of the impending sale. Applying the doctrine of laches, however, the court found that the defendants challenging that sale had significantly delayed in asserting their claims. Alpizar's motion for summary judgment was also granted in part and the court declared that Kampel's bequest to Alpizar was valid to the extent that Alpizar had succeeded to Kampel's rights under the 1969 agreement and under the 1968 deed because, as with the Caspar/Whitten sale, defendants had failed to timely object or take action on this issue until so many years later. Mangerino's motion for summary judgment which was then, as now, largely based upon claims of adverse possession, was denied in the 2002 order because the court found there were unresolved issues of fact, including whether Sample had abandoned the premises in 1978.

In 2010 Carr moved again for summary judgment,[2] as did defendants Caputo/Dominguez, Alpizar and Hoffman/Mangerino, resulting in the order that is the subject of this appeal and cross appeal. The motion court declared that the parties' undivided ownership rights in the building as partners and tenants in

---

**1.** Though notices of appeal were filed from the 2002 order, the appeals were never perfected and were later dismissed.

**2.** The issue of serial summary judgment motions was not raised below by any of the parties or on this appeal, except in the context of judicial estoppel, discussed infra.

common are as follows: Carr, $5/12$; Caputo, $2/12$; Dominguez, $2/12$; Alpizar $2/12$; and Mangerino, $1/12$. As with the court in 2002, Justice Mills found that the doctrine of laches applied, even if the claims were not technically time-barred. The court also found that Alpizar's interest had already been decided in the 2002 order, leaving only the issue of quantifying what that share was.

Carr argues on appeal that the motion court erred in holding that Alpizar has a $1/6$ interest in both the building and the partnership because, when Kampel died, his share reverted to the partnership, notwithstanding that Alpizar had never executed the documents necessary to convey that interest to the partnership. Carr argues that even if Alpizar has an ownership interest in the building and partnership, his interest is only worth the book value of Kampel's $1/6$ interest at the time of his death. Carr presents similar arguments with respect to the interest Mangerino's estate claims to have. She maintains that Bradley never owned more than a $1/12$ interest in the building because Sample kept his own $1/12$ interest when he moved out and later sold it. Although Carr acknowledges that there is no deed to the building in the name of the partnership, she argues that the building should be considered property of the partnership, not the individual partners or their heirs.

On the cross appeal, Mangerino argues that the court erred in finding that Mangerino's estate only has a $1/12$ interest in the partnership and building when it actually has a $1/6$ interest in the building and partnership. Mangerino contends that the Mangerino estate acquired the entire Bradley/Sample $1/6$ interest when Bradley died because Sample abandoned the premises in 1978, never to return, and for more than 20 years, first Bradley, then his heirs, have exclusively controlled and occupied the apartment. Although Alpizar and Mangerino oppose Carr's appeal, no direct opposition has been interposed to Mangerino's cross appeal on the issue of adverse possession. Carr's only argument is that Mangerino's claim is, at most, only worth the book value when Bradley died in 1984. Caputo and Mangerino, who have the greatest legal interest in opposing Mangerino's claim of adverse possession, have not appeared on this appeal at all. Their opposition before the motion court was that Mangerino has no claim to Bradley's interest at all, but if Mangerino's estate does, such interest is, at best, a $1/12$ interest at book value.

■ We reject defendants' argument that Carr's appeal is barred by her lack of standing. By denying Carr's summary

judgment motion for a declaration that Alpizar and Mangerino, as heirs of two of the original partners in the building, are entitled to only the book value of the deceased partners' interest at the time of their death, Carr obtained an order that adversely affected her interests making her an aggrieved party with the right to appeal from that order (CPLR 5511; *Mixon v TBV, Inc.*, 76 AD3d 144, 156 157 [2d Dept 2010]).

■ Also rejected are arguments that Carr is judicially estopped from asserting legal arguments in connection with the second motion for summary judgment (and on appeal) that are at odds with those she advanced in connection with the first motion for summary judgment. The doctrine of judicial estoppel " 'precludes a party who assumed a certain position in a prior legal proceeding and who secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed' " (*Gale P. Elston, P.C. v Dubois*, 18 AD3d 301, 303 [1st Dept 2005], quoting *Ford Motor Credit Co. v Colonial Funding Corp.*, 215 AD2d 435, 436 [2d Dept 1995]). Although Carr has been selective in seeking to enforce the 1969 agreement's terms when beneficial to her but rejecting provisions and transactions that are of no benefit to her, or reduce the value of her own interests, Carr did not "secure" a judgment in her favor on the earlier motion, rendering the doctrine inapplicable to the situation presented (*see Baje Realty Corp. v Cutler*, 32 AD3d 307, 310 [1st Dept 2006]).

■ It was already decided in 2002 that Kampel's bequest to Alpizar was valid and Alpizar had succeeded to Kampel's rights under the 1969 agreement and under the 1968 deed. The 2002 order was never challenged. Carr is not challenging the motion court's decision that Alpizar's interest is $1/6$. Carr argues, however, that Alpizar's interest should be restricted to the book value of the partnership at the time of Kampel's death. That argument, however, is little more than a subset of the overarching argument that the formalities in the 1969 agreement dictate Alpizar's rights and interests in the building and the partnership. As with the broader issue of ownership, the doctrine of laches bars this claim, which limits the value of Alpizar's interest, because Carr significantly delayed in asserting it in a timely manner (*Matter of Schulz v State of New York*, 81 NY2d 336 [1993]). Despite the limitations in the 1969 agreement pertaining to sales, transfers, conveyances, etc., of any partner's interest either during his or her lifetime or at death, the partners openly sold their interests without tendering an offer to the

partnership or other partners, as required in section 14 of the 1969 agreement, and as the partners died off, they disposed of their interests through bequests in their wills. Carr did not object to how Kampel's interest was handled by Alpizar when he died and she did not demand compliance with the 1969 agreement. Neither Carr nor the partnership made any tender of payment to Kampel's estate, notwithstanding the requirement in the 1969 agreement that when a partner dies, the liquidated amount of his or her interest "shall be paid" to the legal representative who is only then obligated to deliver the instruments necessary to effectuate the transfer of that deceased partners' interest. The prejudice to Alpizar is obvious because, for the years following Kampel's death, Alpizar conducted himself as an owner-occupant of the apartment.

Mangerino's cross appeal presents some similar issues. It is unrefuted that whatever interest J.G. Mangerino had when he died was passed on to his estate, no tender was made by the partnership or any individual partner to purchase Mangerino's interest, and no documents transferring those interests back to the partnership were ever signed by the estate representative. Carr's contention, that Mangerino estate has no interest but, if any, such interest is only worth book value, is barred by the doctrine of laches for the same reasons barring Carr's arguments as they relate to the value of Alpizar's interests.

■ We also reject Carr's argument that the partnership is the beneficial owner of the building, notwithstanding how title to the building was recorded over the years and the bequests made by the decedents, who were partners. Although a partner can prove through circumstantial evidence that property actually belongs to the partnership, although held in the name of individual partners, there is no documentation or other evidence indicating that the partners intended, or the partnership was formed, to actually hold title to the building (compare Vick v Albert, 17 AD3d 255 [1st Dept 2005]). The 1969 agreement describes how the partners could dispose of their interests, sets forth rules for governing themselves, and even provides for how the building would be operated, but nothing in the agreement expressly provides that the partnership itself would hold the deed.

■ Mangerino's claim on the cross appeal that the Mangerino estate holds a 1/6, not 1/12, interest rests on issues of adverse possession. This claim affects the "sale" by Sample of his purported 1/12 interest in the building and partnership to Ca-

puto and Dominguez in 2004. That sale was made after the first motion for summary judgment was decided and Sample has since died. Mangerino established before the court below that Sample left and never returned, leaving Bradley, and his heirs (including J.G. Mangerino) in exclusive, hostile possession of the apartment for the prescriptive period (*see Myers v Bartholomew*, 91 NY2d 630 [1998]). Although this means Sample's "sale" to Caputo and Dominguez is invalid, Caputo has not responded to that claim. In the absence of opposition, we hold that the Mangerino estate has a $1/6$, not $1/12$, undivided ownership interest in the building as a partner and tenant in common. Unresolved issues remain, however, about the reallocation and recovery of this $1/12$ interest from Caputo and/or Dominguez. We, therefore, remand to the trial court the issue of whether that $1/12$ interest that the Mangerino estate is entitled to should come from Caputo, individually, Dominguez, individually, or both of them.

We have considered the appealing parties' remaining contentions for affirmative relief and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Donna M. Mills, J.), entered November 17, 2010, which, to the extent appealed from as limited by the briefs, denied plaintiff Estelle A. Carr's motion for summary judgment, granted defendant Henry Alpizar's motion for summary judgment, and granted the motion for summary judgment of plaintiff estate of Royce K. Hoffman and defendant estate of John Gene Mangerino to the extent of declaring that Alpizar has an undivided $1/6$ ownership interest in the subject building as a partner and tenant in common, and defendant estate of Mangerino has only an undivided $1/12$ ownership interest in the building as a partner and tenant in common, should be modified, on the law, to the extent of declaring that the estate of John Gene Mangerino has an undivided $1/6$ ownership interest in the building as a partner and tenant in common, and remanding to the motion court for a reallocation of shares consistent herewith, and otherwise affirmed, with costs.

FRIEDMAN, J.P., MOSKOWITZ, RICHTER and MANZANET-DANIELS, JJ., concur.

Order, Supreme Court, New York County, entered November 17, 2010, modified, on the law, to the extent of declaring that the estate of John Gene Mangerino has an undivided $1/6$ ownership interest in the building as a partner and tenant in com-

mon, and remanding to the motion court for a reallocation of shares consistent herewith, and otherwise affirmed, with costs.